## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**CAROLYN HANS,**

      **Plaintiff,**

**v.**

**BOARD OF SHAWNEE
COUNTY COMMISSIONERS, et al.,**

      **Defendants.**

**Case No. 16-4117-DDC**

<u>**MEMORANDUM AND ORDER**</u>

Plaintiff Carolyn Hans is deaf.  On April 3, 2015, Shawnee County Sheriff Department officers arrested plaintiff for domestic battery and Shawnee County Department of Corrections ("DOC") officers jailed her.  She asserts that this conduct entitles her to relief under 28 U.S.C. § 1983, Title II of the Americans with Disabilities Act ("ADA"), and Kansas state law.  Specifically, plaintiff asserts that defendants Board of Shawnee County Commissioners and Herman T. Jones, Shawnee County Sheriff, violated 42 U.S.C. § 1983 when their employees unlawfully arrested her and violated the Fourth Amendment.  She also alleges that both defendants failed to accommodate her disability and thus violated Title II of the ADA.  Finally, she asserts that both defendants violated Kansas state tort law because their employees falsely arrested her and intentionally inflicted emotional distress on her, and also because defendants negligently trained and supervised their employees.

Defendants have moved for summary judgment against all plaintiff's claims.  Doc. 64. For the reasons discussed below, the court grants summary judgment against all plaintiff's claims.

## I.    Facts

The following facts govern this motion.  They are uncontroverted or, where controverted, are recited in the light most favorable to the plaintiff, the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### A.    Plaintiff's Background

Plaintiff Carolyn Hans has a hearing impairment and is a qualified individual with a disability under the ADA.  She was born deaf and her parents are deaf.  She first learned to communicate by American Sign Language ("ASL").  Because plaintiff's family and friends are deaf, ASL is plaintiff's primary form of communication and she uses it on a day-to-day basis. She also uses ASL with the general public when an interpreter is present.  When no interpreter is present, she commonly communicates by writing notes.  Typically, she communicated with her husband, Raymond Hans, through handwritten notes.  Plaintiff can "lip read just a tiny, little bit." Doc. 72-3 (Hans Dep. 25:3–4).  She described it as being able to catch one or two words at a time, but she also said she misses most of what is said.  To communicate by phone, plaintiff has used a video relay service on her phone for about three years.

Plaintiff has designated Dr. Jean Andrews, a Ph.D. in speech and hearing, as an expert in this case.  Dr. Andrews has provided an opinion that English is plaintiff's second language.  Dr. Andrews also opines that plaintiff would have difficulty learning to read and understand English because it is an auditory-based language.  Dr. Andrews explained, "You must hear the English [language] to learn to read it."  Doc. 72-13 at 8 (Andrews Report).

Dr. Andrews believes that English language modes of communication, including "speech, lipreading, reading and writing do not constitute effective modes of communication for [plaintiff]."  *Id.* at 5 (emphasis in original).  Dr. Andrews tested plaintiff extensively and opines

that lip reading is not an effective form of communication for plaintiff because she only understands short, superficial statements.  Dr. Andrews opines that lip reading enables plaintiff to understand about 64% of what is being said.  Based on extensive written testing, Dr. Andrews also opines that plaintiff is not fluent in English and does not have the skills to communicate in English in complicated situations with serious consequences.

When she was deposed, plaintiff was employed as a part-time substitute teacher at the Arkansas School for the Deaf.  Plaintiff previously had worked at the Topeka Independent Living Resource Center, where she had an interpreter available to her to help her communicate. Plaintiff also worked for Sprint for many years.  While employed by Sprint, Sprint provided an ASL translator for meetings or other events requiring "important communication."  Doc. 72-3 (Hans Dep. 20:11–19).

### B.    April 3, 2015

#### 1.    Dispatch

On April 3, 2015, plaintiff called 911 emergency from her cellphone.  Shawnee County 911 Dispatch answered the call.  Shawnee County has an Emergency Communications Standard Operating Procedure ("SOP") for handling 911 calls it receives from hearing-impaired callers. This SOP addresses calls placed from Telecommunications Device for the Deaf ("TDD") phones and the Kansas Relay Service.  Despite this SOP, plaintiff was unable to communicate with the dispatcher.

Instead, plaintiff's husband, Raymond Hans, spoke in the background and told the dispatcher that his wife was the one who had dialed 911 and that she is deaf.  Mr. Hans told the dispatcher that he and plaintiff were having a domestic argument and gave the dispatcher the

address of their home.  Mr. Hans also provided his name and plaintiff's name to the dispatcher.
The call then was disconnected.

Shawnee County has an Emergency Communications SOP for telephone procedures.
This SOP instructs the person answering a 911 call that is disconnected to make one attempt to
re-contact the dialing phone.  Consistent with the SOP, the 911 dispatcher called the number
plaintiff had used to call 911 emergency.  The call was answered, and Mr. Hans, again speaking
in the background, informed the dispatcher that plaintiff previously had hung up.  Mr. Hans
informed the 911 dispatcher that he and plaintiff were sitting in a tan Cadillac arguing, but that
officers would find him outside the car when they arrived.  This second call then disconnected.

Plaintiff made several more calls to 911 on April 3, 2015.  Reports from the Shawnee
County dispatch department show that plaintiff placed four 911 calls—calling at 8:45 p.m., 8:47
p.m., 8:48 p.m., and 8:59 p.m.  According to dispatch reports, Mr. Hans told the 911 dispatchers
that his wife wanted to leave but he did not want her to leave because he wanted "to talk about
it."  Doc. 72-4 at 2 (Dispatch Incident Report).

Deputy Justin Dobler and Corporal Jace Beightel from the Shawnee Country Sheriff's
Department were dispatched to the Hans's address at 8:56 p.m.

## 2.    Officers' Interaction

Corporal Beightel arrived at the Hans's residence eight minutes later at 9:04 p.m. and
Deputy Dobler arrived there separately about 10 minutes after Corporal Beightel.  Dispatch had
collected some information from the four 911 calls.  But during their depositions, neither officer
could remember if he had reviewed that information before interacting with plaintiff and Mr.
Hans.  Specifically, Corporal Beightel recalled that he had arrived on scene 10 minutes before

Deputy Dobler, but he does not remember if he reviewed the information collected by dispatch while he waited.

The dispatch reports established that:  (1) Mr. Hans and plaintiff were married; (2) plaintiff was deaf; (3) plaintiff had called 911; (4) plaintiff wanted to leave the home and Mr. Hans would not let her leave because he wanted to "talk about it"; (5) Mr. Hans had been drinking; and (6) no weapons were present.  *Id.*

After Corporal Beightel and Deputy Dobler had arrived, they walked toward plaintiff's front door together.  Corporal Beightel activated his body camera.  Deputy Dobler did not have a body camera issued to him at that time because camera usage was still in its initial phases within the Sheriff's Department.  Corporal Beightel's camera recorded footage of several interactions between the officers and plaintiff.[1]

When he responded to this call, Corporal Beightel was suffering from an upset stomach. The first audio captured by Corporal Beightel's body camera recorded him telling Deputy Dobler, "If there's, if there's not charges, I wanna, I . . . we're getting this shit done.  But by the book as well."  When asked what he meant by this, Corporal Beightel explained that "[his] stomach was upset and [he] didn't want to drag things out for longer than they needed to be." Doc. 72-6 (Beightel Dep. 114:4–6).

When the officers reached plaintiff's front door, plaintiff was walking through the entry way and her dogs were barking.  Corporal Beightel opened the glass storm door, stepped inside, and asked plaintiff, "Are the dogs mean?"  Plaintiff quickly turned to face Corporal Beightel and gestured up the stairs.  She then said, "It's ok."

---

[1]    Unless cited otherwise, the court takes the quotes in this subsection from Corporal Beightel's body camera footage, as reproduced in Exhibits 11, 12, and 13 to Document 65.

Corporal Beightel entered the house to speak with Mr. Hans, and Deputy Dobler motioned for plaintiff to step outside with him.  Corporal Beightel's body camera footage suggests that Deputy Dobler interviewed plaintiff twice.  Both times they were alone.  After the two interviews, the officers conferred privately.  And then Deputy Dobler interviewed plaintiff a third time.  Again, they were alone.  While Deputy Dobler spoke to plaintiff alone, Corporal Beightel spoke with Mr. Hans alone.  Then both officers spoke with Mr. Hans and plaintiff, separately.

Initially, Deputy Dobler asked, "What happened?" and plaintiff responded by gesturing that she had pushed Mr. Hans.  Corporal Beightel's body camera footage shows that Deputy Dobler's initial interaction with plaintiff lasted about two minutes and 50 seconds.  Deputy Dobler did not use written notes to communicate during this interaction, but at some point, he wrote at least one note to ask if plaintiff had some place else to go.

Meanwhile, Corporal Beightel spoke with Mr. Hans inside the house.  Right away, Corporal Beightel asked Mr. Hans whether the parties had gotten "physical."  Mr. Hans responded, "She pushed me down in the mud and stomped on my hand but other than that, no sir."  Then, he reported, he got into an argument with plaintiff.  She became upset and left. When she returned, Mr. Hans reported that he tried to get in her car to leave.  But plaintiff got in the car and called 911.  Mr. Hans again stated, "When I got out, she stomped on my hand, threw me down in the mud."  Mr. Hans told Corporal Beightel several times that plaintiff had pushed him down in the mud and stomped on his hand.  Mr. Hans had visible injuries on the top of his hand.

Corporal Beightel asked Mr. Hans, "Do you wanna file a written statement of what happened?"  Mr. Hans responded, "Uh, if that's what I . . . ."  Corporal Beightel interrupted Mr.

Hans and said, "If you do wanna press charges against her, then . . ." Corporal Beightel later told Mr. Hans, "You don't have to file a, a written statement is a voluntary statement."

After speaking with plaintiff the first time, Deputy Dobler interrupted Corporal Beightel's interview of Mr. Hans to ask if he had keys for the Cadillac. He responded that he did, and then Mr. Hans volunteered that plaintiff had the keys for his work truck. Corporal Beightel instructed Deputy Dobler to "go ask [plaintiff] if she pushed him down in the mud." While Deputy Dobler spoke to plaintiff a second time, Corporal Beightel told Mr. Hans, "If she says that she pushed you down on the ground, that she pushed you, she has to go to jail. No ifs, ands, or buts, it's not our choice." Later, Corporal Beightel reiterated this point: "If that's what happened, if she says that's what happened, she's gotta go to jail." Corporal Beightel then asked Mr. Hans again, "It's a voluntary statement, do you want to fill one out? You can say no, you can say yes." Mr. Hans then declined to provide a written statement.

After the second interview with plaintiff, Deputy Dobler returned inside the house and asked Mr. Hans if he was trying to interfere with plaintiff's vehicle—the Cadillac. Mr. Hans responded that he was trying to unscrew the cap on one of the vehicle's tires when plaintiff approached him from behind and stomped on his hand, breaking through the nail on one finger. Deputy Dobler interjected. He said, "She was protecting her property 'cause she thought you were damaging it . . . ." Deputy Dobler later commented, "If you came up to my car and I caught you messing with it, I'd push you away from it, too."

The officers then conferred privately. After they conferred, Deputy Dobler spoke to plaintiff a third time. This interaction lasted a little longer than one minute. He asked plaintiff why she had pushed Mr. Hans down and stepped on his hand. At the same time Deputy Dobler was speaking with plaintiff, Corporal Beightel told Mr. Hans that if there was probable cause to

believe that a battery had occurred, Kansas law left them no choice:  They had to take the aggressor to jail.

Then, Deputy Dobler re-entered the house and asked to look at Mr. Hans's hand.  Mr. Hans explained that when plaintiff pushed him over, she came over the top of him and stomped on his hand.  Mr. Hans then said that plaintiff had not stomped on his hand intentionally.

Deputy Dobler explained to Mr. Hans that plaintiff had told him Mr. Hans was letting air out of one of the Cadillac's tires.  As he said this, Deputy Dobler made a rotating motion with his right hand as if he were unscrewing something.  Then, Deputy Dobler explained that plaintiff "went like this"—and he made a sweeping motion with his arms outstretched, palms facing up. Deputy Dobler told Mr. Hans she did this to get him away from the tire.

The officers then spoke with Mr. Hans briefly.  Corporal Beightel and Deputy Dobler discussed whether plaintiff had stepped on Mr. Hans's hand accidentally and, if that was the case, then no battery had occurred.

The officers took the truck keys from plaintiff to give to Mr. Hans, and the Cadillac keys from Mr. Hans to give to plaintiff.  At that point, plaintiff planned to leave the scene so she and Mr. Hans would be separated.

While officers exchanged the keys with Mr. Hans, they told him that he shouldn't allow an argument to reach that point before calling law enforcement.  Mr. Hans responded:

> Yes sir, I get it man.  You guys already arrested me once.  She split my head with a sprinkler, and I was working on my Harley, and I put her against the wall and pulled the sprinkler out of her hand (inaudible).  When you guys showed up, it looked like I had choked her, the grease marks, and I went to jail for that.  So I do understand how it works, I don't wanna go to jail.  That's why when she called you guys when we were sitting in the car and then hung up, I came in the house and called you back.  I knew that was a bad thing, bad, bad.  And I know you guys, you're busy, it's a Friday night, you got better things to do.

8

Ex. 13 to Doc. 65 (Beightel Body Camera Footage at 1:49–2:22). Then, Mr. Hans reiterated, "Yeah like I said, after the last time, I learned my lesson, and as soon as she called while we were in the car, I'm like goddamn I'm going to jail."

When the officers went outside to give plaintiff the keys to the Cadillac, Corporal Beightel asked plaintiff, "Are you going to go to a friend's house?" His speech was slow and deliberate. Plaintiff responded, "My cousin's." Plaintiff tried to communicate something else orally. Corporal Beightel said, "What?" Plaintiff tried to communicate orally again. She then began to walk in the house. Corporal Beightel responded, "Hang on. Yeah, well." Corporal Beightel followed her into the house. Mr. Hans was standing in the entry way and Corporal Beightel asked, "What does she need?" Mr. Hans orally asked her what she needed while using gestures that may have included ASL signs. He then informed Corporal Beightel that she needed her suitcase.

After plaintiff collected her bags to leave, Corporal Beightel asked plaintiff, "Do you understand you were this close to going to jail?" Again, his speech was slow and deliberate. And he used gestures as he asked the question. While he was saying "you" he pointed at plaintiff. And while he said "this close" he held his right index finger and thumb less than an inch apart. Plaintiff responded, "Me, why?"

Then, plaintiff communicated by speaking and gesturing that Mr. Hans was trying to let the air out of her tires. She raised her leg and made a downward gesture with it—seemingly reenacting a kick or push with the bottom of her foot. She then told the officers that Mr. Hans threw something at her eye. She tried to communicate something else orally and Corporal Beightel responded, "Huh?"

Plaintiff then walked down the driveway to the Cadillac.  As she walked, she tried to communicate orally with the two officers.  Neither one responded.  Once plaintiff reached the Cadillac, she gestured by the front passenger-side fender in a manner consistent with someone letting air out of the front tire, followed by a kicking motion and a gesture suggesting a two-handed push.  She then walked around the front of the car and picked up a dog bone, saying and gesturing that Mr. Hans had hit her in the eye with the bone.  Corporal Beightel asked plaintiff, "Did it hit you?"  Plaintiff responded, "It did" and pointed to her left eye.[2]

After plaintiff's interaction with the officers near the Cadillac, Deputy Dobler decided to arrest plaintiff for Domestic Battery.  Deputy Dobler construed her actions as ones reenacting conduct where she had kicked and pushed Mr. Hans.  He said plaintiff was "emotional," and he interpreted her actions as a "stomp, kick, and push" that "without a doubt" were intentional. Doc. 72-5 (Dobler Dep. 60:11–61:5, 68:8–13).  Deputy Dobler did not arrest plaintiff for pushing Mr. Hans.  Instead, he explained, he decided to arrest her for "stepping" on Mr. Hans and kicking him.  *Id.* (94:22–95:2).

Corporal Beightel did not interpret any of plaintiff's gestures to communicate that she had stomped on Mr. Hans's hand.  But, he said, he understood her gestures to amount to an admission that she had kicked Mr. Hans, and this admission established probable cause for the officers to arrest her.

After plaintiff alleged that Mr. Hans had thrown a dog bone at her, Corporal Beightel revisited Mr. Hans inside and asked him whether he threw anything at plaintiff.  Mr. Hans denied that he had done so.  Corporal Beightel then told Mr. Hans:

---

[2]    During this interaction with the officers, plaintiff tried to communicate with them orally.  But during the officers' later review of the body camera footage, the officers could not understand several aspects of what plaintiff was trying to say.

> She's going to jail.  She's going to jail.  She told us you threw something, hit her in the eye.  What she did, after she, it was explained that she may go to jail, was a different description than what she said the first time.  So, she's going to jail.  Um, she won't be able to call you tonight, so you guys will be separated for the night.  Do you have any questions for me?

Ex. 13 to Doc. 65 (Beightel Body Camera Footage at 7:50–8:17).

Corporal Beightel then walked back down the driveway to the Cadillac.  He instructed plaintiff to get her purse and bring it with her as she was headed to jail.  As he said this to plaintiff, he made a waving motion toward his body with both hands.  Plaintiff reached into the Cadillac and picked up her purse.  Corporal Beightel also asked plaintiff if she had her keys.  She looked in her purse, pulled out her keys, and showed them to Corporal Beightel.

Deputy Dobler then told plaintiff, "If you stay cooperative, I'll put the cuffs in front and not in back, deal?"  Deputy Dobler used gestures as he spoke.  As he said "you" he pointed at plaintiff.  As he said "in front," he held his wrists together in front of his body.  And as he said "in back," he held his wrists together behind his body.  Plaintiff responded, "Okay" and held her wrists up in front of her body.  Deputy Dobler then placed plaintiff under arrest and handcuffed her, with her arms in front of her body.

The entire interaction at the house among plaintiff, her husband, and the two officers lasted about 30 minutes.  Plaintiff never asked for a sign language interpreter during this interaction.  She now claims that she believes it was the officers' job to provide an interpreter.  Dr. Andrews, plaintiff's expert, opines that plaintiff, to understand what was happening and to ensure adequate communication during the process, needed a qualified ASL interpreter.

Deputy Dobler transported plaintiff to the Shawnee County DOC in his patrol car.  He did not communicate with her during this transport.

11

The District Attorney declined to pursue criminal charges against plaintiff noting, "There is insufficient evidence of a criminal offense." Doc. 72-7.

### 3.    Plaintiff's Description of the April 3, 2015 Arrest

At her deposition, plaintiff testified about the entire incident leading to her arrest. An ASL interpreter assisted her during this deposition. Plaintiff took about 30 minutes to describe the events. Her version of the events follows.

On April 3, 2015, plaintiff and Mr. Hans were having an argument at their home. She tried to leave but Mr. Hans took the keys to their Cadillac. So plaintiff grabbed the keys to their truck. After plaintiff grabbed the truck keys, Mr. Hans got in the Cadillac and backed out to block the truck, presumably so that plaintiff could not leave in it.

Plaintiff jumped in the Cadillac and called 911. Plaintiff called 911 because she wanted the Cadillac keys back. She also felt like she was in danger because Mr. Hans was really, really mad and had been drinking. By this point, the parties had engaged in no physical contact.

After her calls to 911, Mr. Hans told plaintiff, "[T]he cops are on the way." Doc. 72-3 (Hans Dep. 57:17). Mr. Hans then got out of the Cadillac and opened the hood. Plaintiff did not know what he was doing, but she suspected he was messing with the car's wiring. She got out of the car and closed the hood.

After plaintiff closed the hood, Mr. Hans found "something" and threw it at plaintiff's face, striking her. *Id.* (57:23–25). Plaintiff had no idea what Mr. Hans threw at her. Then, Mr. Hans went to the garage and retrieved a tool. He then tried to bleed air out of the Cadillac's tires.

Plaintiff concedes that when Mr. Hans tried to drain air out of the Cadillac's tires, she tried to push him away from the tire. First, she said, she used her hands to push him. When he got back up and tried again to drain air out of the tire, she put her foot on his buttocks and pushed

12

him.  Plaintiff characterized this conduct as a "push"—and not a kick.  *Id.* (56:24–25).  She said

that Mr. Hans had so much to drink that he tipped over easily.  She barely had to push him.

Mr. Hans was on his hands and knees on the ground.  And plaintiff was behind him.  She

did not stomp on his hand.  But plaintiff told Dr. Jean Andrews, her expert, that she stepped on

one of his fingers, albeit accidentally.

After the altercation by the Cadillac's tire, both plaintiff and Mr. Hans went back inside

their home and waited for police to arrive.  Plaintiff waited near the front door of her home.

### C.    Shawnee County Department of Corrections

After arresting her, Deputy Dobler transported plaintiff to the Shawnee County DOC.

When plaintiff arrived there at 10:20 p.m., former Shawnee County corrections officer Angelica

Hutting booked plaintiff into the facility.  Officer Hutting lacks an independent recollection of

booking plaintiff into the facility.  But, she testified about her usual practice for booking a

hearing-impaired individual in the DOC.  Officer Hutting explained that if she experienced

difficulty communicating with a deaf person, she used a combination of written notes and written

forms that the arrestee could use to follow along.  Officer Hutting also knew that Shawnee

County had access to interpreters.  She explained that she involved interpreters if she thought the

inmate was not comprehending.  Plaintiff recalls that Officer Hutting used written materials to

cover the intake questions.

### 1.    Screening

All inmates processed into the DOC are screened for the risk of suicide.  Following this

screening process, the DOC can place an inmate in general population (low risk), close

observation (moderate risk), or on suicide watch (elevated risk).  Officer Hutting conducted the

plaintiff's initial screening.  Following the screening, Officer Hutting prepared an Officer's

Report Sheet about plaintiff.  The report provides, "Subject was booked in for domestic battery.

Subject indicated that she feels 'a little bit' hopeless and helpless.  Subject takes medication for

depression.  This is Subject's first arrest."  Doc. 72-22.  When asked where she got the

information to write that plaintiff felt "a little bit" hopeless and helpless, Officer Hutting did not

recall.  She volunteered that her "best guess" is that plaintiff wrote that down on her printed copy

of the questions.  Doc. 72-8 (Hutting Dep. 74:17–22).

    Officer Hutting prepared the report sheet based on her initial screening of plaintiff.

Plaintiff's initial screening questionnaire provides, in part:

       Initial Classification Suicide Questions

| | | |
|---|---|---|
| 1. Ever Attempted Suicide? | No | |
| 2. Had thoughts of hurting yourself? | No | |
| 3. Thinking of hurting yourself now? | No | |
| 4. How would you attempt suicide? | No | |
| 5. Do you have means to do so now? | No | |
| 6. Recent loss/death of loved one? | No | |

       Initial Classification Victimization Questions

| | | |
|---|---|---|
| 1. Is inmate/juvenile particularly small? | Yes | Depression |
| 2. Past child abuser (Juvenile = abuse victim)? | Yes | |
| 3. Is inmate/juvenile effeminate? | Yes | A little bit |
| 4. Other reason for protective custody? | No | |

       Initial Classification Mental Health Questions

| | |
|---|---|
| 1. Diag. Mental Illness? (Include family of juvenile) | No |
| 2. Taking Psychotropic Medication? | No |
| 3. Past in-patient MH care? (include family of Juv.) | No |
| 4. Are You Feeling Helpless and Hopeless Presently? | No |
| 5. Have You Ever or Are You Presently Hearing Voices? | No |

Doc. 72-9 at 1.  When asked why the questionnaire does not report that plaintiff said she felt a

little bit helpless or hopeless, Officer Hutting explained:

    It appears as though I entered the responses to the questions for the mental health
    questions I entered as responses to the questions for victimization questions.  It also
    appears as though I may have entered the responses for the victimization questions into
    the field for the responses for the mental health questions.

Doc. 72-8 (Hutting Dep. 71:17–23).

But when one switches the answers to the two groups of screening questions, the answer to the question, "Are you feeling helpless and hopeless presently?" still does not line up with "yes," "a little bit." That is, the "helpless and hopeless question" is the fourth question in its sequence and the "yes[,] a little bit" answer is listed as an answer for the third question in its group. When asked about this alignment, Officer Hutting explained, "It appears as though I made a mistake in where I entered that information." *Id.* (73:8–9).

Based on Officer Hutting's responses in the initial screening questionnaire, Sergeant Anderson came to the DOC book-in area to conduct a suicide screening of plaintiff. Sergeant Anderson conducted her screening using the DOC's screening form. Dr. Andrew White, an expert consultant in jail and prison suicides, helped the DOC construct this screening form.

To complete plaintiff's suicide screening and intake form, Sergeant Anderson and plaintiff sat side-by-side at a computer screen. Sergeant Anderson pointed to each question, and plaintiff then read the question silently. Plaintiff would respond yes or no, and Sergeant Anderson would type her response into the computer. If Sergeant Anderson didn't understand her answer, he directed her to write her answer down. Sergeant Anderson recalls using notes to communicate with plaintiff when he did not understand her. But he testified that he had discarded those notes.

Plaintiff had been taking medication for depression for many years before the events of April 3, 2015. When she was arrested, plaintiff was taking Effexor, a medication she said she used to treat depression. And within the year immediately before her April 3, 2015 arrest, plaintiff had been hospitalized for depression for three days. Plaintiff told Sergeant Anderson in

writing that she had been hospitalized at Valeo in the past year for psychiatric care and

treatment.  She also wrote down her list of medications.

Sergeant Anderson knew that the jail had an interpreter for non-English speaking

individuals.  Specifically, Sergeant Anderson said, "If the communication barrier is there, I will

get someone to get the communication there."  Doc. 72-10 (Anderson Dep. 80:19–20).  But he

never has had a communication barrier with a hearing-impaired inmate and thus never has called

in a sign language interpreter during DOC's admission process.  He added, "If they request it

then I will sure get one."  *Id.* (81:4–5).  It is not clear whether Sergeant Anderson was speaking

hypothetically.

In response to the Screening Form's question that asks, "Does the inmate feel that there is

nothing to look forward to (expresses feelings of hopelessness)?," Sergeant Anderson recorded

plaintiff's response as:  "A little bit."  Plaintiff gestured and used facial expressions to respond to

this question.  She explained, "Those were his words that he wrote down."  Doc. 72-3 (Hans

Dep. 75:10–11).  When asked on follow up, "So you did not say, a little bit?," Plaintiff reiterated,

"No.  I didn't say a little bit.  There was no interpreter or anything.  There was no written notes.

It was just this form and pointing to him.  So, I was doing my best."  *Id.* (75:13–16).  When

asked a third time, plaintiff again explained, "I just showed a gesture that—that—just that

exasperation . . . I was in shock, I don't know.  That was my expression to him, my gesturing to

him."  *Id.* (76:4–9).

The answer column for this Screening Form question contains a bold outlined box.  This

bold outline indicates that a positive answer to this question requires an automatic suicide watch

placement.  Dr. White's expert report opines:

> Hopelessness is a clinically accepted factor relevant to the assessment of suicide
> risk and as such, is fully appropriate for placement in a screening instrument.

> Including it on the screening form is based not only on the clinical significance of the concept, but also on [the DOC's] goal to develop a comprehensive, conservative assessment tool that minimizes offender risk . . . identifying Hopelessness as a mandatory requirement for suicide watch placement is reasonable and prudent as well as within the discretion of administrators, given that the instrument was of use by correctional officers as a first-line screening tool.

Doc. 65-23 at 12 (White Report).

The DOC policy provides, "if any of the double line outline boxes in the 'Yes' column have been checked but no bold-outline boxes, the screener shall at least place the inmate on Close Observation status, unless the combination of boxes checked indicates that the inmate needs to be placed on Suicide Watch." Doc. 65-22. Even when none of the bold or double line outline boxes on the suicide screening form are checked, the screener still has authority to make a judgment call about appropriate placement. This includes placing the inmate on Close Observation or even Suicide Watch status.

Plaintiff's response to the form's question, "Does the inmate feel that there is nothing to look forward to (expresses feelings of hopelessness)?" was the main reason Sergeant Anderson concluded he should place plaintiff on suicide watch. He identified other reasons as well: It was her first arrest, her charges were for domestic battery, and she had a history of depression. Dr. White's report also opines:

> [Sergeant] Anderson's interactions with Ms. Hans were conducted in a professional and well intentioned manner that enabled him to complete the assessment. When he was directly asked about the mandatory suicide placement item, he indicated that given the totality and seriousness of her "yes" responses to the questionnaire items (two mandatory close observation items, one mandatory suicide watch, one domestic crime, a battery offense (Violence), previous hospitalization for Depression, currently on medication for Depression, and first arrest) he would have taken the precaution of placing her on suicide watch. Under the circumstances, Sgt. Anderson's decision, in my judgment, was reasonable and prudent and clearly was within the scope of his duties and responsibilities, as well as in Ms. Hans's best interest.

Doc. 65-23 at 10 (White Report).  Finally, Dr. White opines:

> [E]ven though Ms. Hans indicated she was not currently thinking of killing herself, it is well known that people contemplating suicide do not always tell the truth when asked and/or subsequently change their mind or even make an impulsive attempt with little or no warning.  As such, correctional personnel, particularly supervisory officials, are encouraged and authorized to use their experience and judgment to make decisions about the well-being of an offender when they have sufficient reason to do so.  In my view, that is exactly what Sgt. Anderson did when he placed Ms. Hans on suicide watch, which he apparently could have done based on other items on the questionnaire, regardless of the Hopelessness item's mandatory placement requirement.

*Id.* at 12.

Once Sergeant Anderson completed plaintiff's suicide screening, Michael Adams, a medical nurse employed by Corizon, conducting a medical screening.  When Mr. Adams asked plaintiff the same screening questions that Sergeant Anderson and Officer Hutting had asked her, some of plaintiff's answers contradicted the answers that Officer Hutting and Sergeant Anderson had recorded.  Specifically, Mr. Adams recorded plaintiff's answer to the helpless/hopeless question as "no."

### 2.    Strip Search and Jail Cell

After the medical screening, a female officer strip-searched plaintiff.  Officer Hutting filled out a "Strip Search Form" for plaintiff.  The form provides multiple reasons why a strip search may be warranted.  Officer Hutting marked a box labeled:  "The arrestee has recently attempted or threatened suicide or has a known history of suicide attempts or threats."  Doc. 72-23 (Strip Search Form).

When asked about the form and the box she had checked on it, Officer Hutting explained:

> That would be the box that we would check if the person screened out on to suicide watch.  It's not worded very well on this document, but there is no box to check for a person indicating that they feel hopeless or helpless.  So, this is the closest related box that would be indicated.

Doc. 72-8 (Hutting Dep. 96:15–20).  Officer Hutting also explained that when a person was placed on suicide watch, officers automatically perform a strip search of that person.

Following her strip search, plaintiff was issued an anti-suicide smock.  Plaintiff's smock did not fit her properly so she also was given an anti-suicide blanket.  At 1:05 a.m. on April 4, 2015, plaintiff entered her cell.

When plaintiff first arrived at the DOC, she could communicate by written notes.  But once she was in her cell, she had to gesture to request things.  For example, she gestured that she had to urinate so she was provided toilet paper.  She also requested water by gesturing.

Plaintiff never requested a sign language interpreter from anyone at the DOC.  Dr. Andrews, plaintiff's expert, opines that plaintiff needed a qualified ASL interpreter to understand what was happening during DOC's booking process and to ensure adequate communication during that process.

### 3.    Release

The next afternoon, April 4, 2015 at 2:53 p.m., Shawnee County, Kansas District Court Judge Kingfisher conducted a bond review and completed a probable cause determination form. Judge Kingfisher determined probable cause existed for plaintiff's arrest and set plaintiff's bond at $5,000 cash or professional surety.  Judge Kingfisher ordered, as a condition of bond, that plaintiff report to Court Services immediately upon release.

Bond was posted by Back Out Bail Bonds.  About an hour later, at 4:00 p.m. on April 4, plaintiff was removed from her cell.  Corrections Officer Jeannie Vincent then booked plaintiff out of the DOC facility and released her at 4:30 p.m.

At discharge, the bond paperwork—including Judge Kingfisher's bond conditions containing the requirement for plaintiff to report to Court Services immediately upon release—

was provided to plaintiff in writing.[3]  The bond company also told plaintiff that she would need to meet with a Court Services Officer ("CSO").  Plaintiff ultimately attended the meeting with her CSO, Mary Herman.[4]  They communicated using written notes.  No interpreter was provided.[5]

### D.    Shawnee County Department of Corrections Memorandum

In response to a complaint plaintiff filed, Matt Biltoft, a 19-year employee of the Shawnee County Department of Corrections, was tasked with creating a timeline of plaintiff's booking process at the DOC.  Mr. Biltoft once worked as a corrections specialist, but now works as an intelligence and investigations officer.

Mr. Biltoft spoke with Sergeant Anderson about his interaction with plaintiff.  Of note, Sergeant Anderson told Matt Biltoft that plaintiff could read lips.  Mr. Biltoft relied on Sergeant Anderson's representation.

When preparing his report, Mr. Biltoft did not interview Nurse Adams about the intake questionnaire he had prepared or its answer contradicting Sergeant Anderson's suicide screening. He also did not interview Officer Hutting about the errors in the intake questionnaire she had completed.  Nor did he make any notes highlighting the inconsistencies among the reports prepared by Officer Hutting, Sergeant Anderson, and Nurse Adams.  Mr. Biltoft completed his report in two days and submitted it to his supervisor.

Later, during a deposition, Mr. Biltoft described his knowledge and training.  For non-English speaking inmates, Shawnee County uses a service called "Language Line" that has

---

[3]    No DOC employee has authority or ability to make arrests.

[4]    Court Services Officer Mary Herman is an employee of the State of Kansas, not Shawnee County. Court Services is a department of the State of Kansas, not Shawnee County.

[5]    No DOC employee has the authority to determine or arrange for aids or services to be provided at a meeting with a CSO.

training and pamphlets available to jail staff.  This service can provide translation over the phone and also offers ASL interpreters for in-person support.  Mr. Biltoft did not recall attending a specific class about hearing-impaired individuals, but he had received on-the-job training.  Mr. Biltoft also explained that the County had policies about the Americans with Disabilities Act. But he was not sure whether those policies or his training covered the legal requirements of the ADA.

### E.    September 25, 2015

Almost six months after her arrest, plaintiff contacted Shawnee County 911 dispatch using a relay service.  She initiated this call on September 25, 2015.  She told the dispatcher that she wanted to file a report for domestic battery.  The dispatcher advised plaintiff that a Topeka Police officer would respond to her call, in person, unless she preferred to come to the Topeka police station to file a report.  Plaintiff informed the dispatcher that she would need an interpreter so she thought it best for her to come to the station where she could use the relay service on her phone.  The dispatcher agreed to the approach proposed by plaintiff.

After more conversation, plaintiff told the dispatcher the location of the alleged battery, and the dispatcher told plaintiff she would need a Shawnee County Sheriff's deputy to respond in person or a deputy could meet her at the same station, but in another wing of the police station. Plaintiff asked to meet the deputy at the station, and the dispatcher again agreed.  The dispatcher then asked plaintiff's name, her phone number, the suspect's name, and the type of car she would be driving to the station.  The dispatcher asked to confirm that plaintiff could use the video relay service on her phone.  Plaintiff responded "yes" to this question.  Plaintiff also told the dispatcher, "Usually that's not allowed, but for an emergency situation it is allowed, and this is an emergency, so I will go ahead and use Convo Relay as a video relay interpreter on my

iPhone." Ex. 30 to Doc. 65 (Audio recording of plaintiff's September 25, 2015 phone call). The dispatcher then gave plaintiff directions to the Shawnee County Sheriff's location at the Law Enforcement Center. Shawnee County Sheriff's Officer Brett Butell waited nearly 45 minutes for plaintiff to arrive at the Law Enforcement Center. But she never appeared.

**F.      Shawnee County Policies and Training**

The Shawnee County Sheriff's Department has a policy informing its officers how to handle and process domestic violence calls. This policy, along with all Sheriff's Department policies, are provided to the officers in training and they can access the policies on the computers located in their patrol cars.

The domestic violence policy provides, in part:

III. B. Responding Officers' Responsibilities:

> 1. Whenever officers investigate a domestic violence call, they **shall** investigate the situation thoroughly in the same manner expected of other cases, in order to determine the appropriate response to be taken.
>
> 2. In domestic violence situations, the responding officers **should**, to the extent of the available time and resources, do the following:
>
>> a) Receiving the Call:
>>
>>> (1) Officers should begin compiling information to formulate a plan of action that will minimize the risk to responding officers and affected citizens.
>>>
>>> . . .
>>
>> f) Assessing the Situation:
>>
>>> (1) If the victim sustained any obvious and visible injuries or if there is property damage, photographs should be taken.
>>>
>>> . . .

(5) The investigation should include written statements from the victim and witnesses, if possible.

(6) Where possible, a written statement should be obtained from any suspect while considering safety factors and Miranda issues.

. . .

g) Determining the Action to be Taken:

. . .

(2) While injury is at least one of the stronger "building blocks" of probable cause, it is not necessary for the victim to have been injured to establish the existence of probable cause.

(3) In cases where there are unsubstantiated allegations of violence, a victim's willingness to make a statement, preferably in writing, may be used as a part of the overall probable cause development.

(4) It is up to the responding officers to determine whether none, one or both of the participants are arrested when both participants accuse the other of domestic violence.

(a) Officers should make a probable cause determination as to whether one of the parties can be labeled the "primary physical aggressor" who causes the other to commit "defensive combat" only.

(b) Or whether both parties instigated domestic violence.

(c) When determining whether a subject's actions were "defensive combat", officers should consider K.S.A. 21-5222 (Use of Force in Defense of a Person), which states:

(i) A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another

>           against such aggressor's imminent use of unlawful
>           force.
>
>           (5) The statements of each party and any witnesses should
>           be evaluated independently along with the available
>           evidence and other observations made by the officers,
>           probable cause determined, and appropriate action taken
>           consistent with this policy.

Doc. 72-15 at 2–4 (emphasis added).

Both Corporal Beightel and Deputy Dobler recalled receiving training about domestic violence situations. Corporal Beightel did not recall if that training had included a review of Shawnee County's domestic violence policy. But Deputy Dobler explained that his training covered the policies addressing that topic.

On the distinction between the policy's use of the word "shall" and "should," Deputy Dobler clarified, "Should is suggest and shall is you have no discretion." Doc. 78-3 (Dobler Dep. 170:13–15). Corporal Beightel also explained that "should" in policies provides officers discretion.

The Shawnee County Sheriff's Department also has a policy governing its officers' conduct in situations when a person has limited English speaking proficiency.

This policy provides in relevant part:

III. PROCEDURE

>           A. Identification of Primary Language
>
>                   1. SNSO personnel should avoid assumptions about an individual's
>                   primary language.
>
>                   . . .
>
>           B. Interpreter Services
>
>                   . . .

> 2. Family members . . . should not be used for interpretations, especially for communications involving witnesses, victims and potential suspects . . . except temporarily in unforeseen, emergency circumstances while awaiting professional interpretation . . . .

Doc. 72-16 at 1–2.

When asked about plaintiff's primary language, Deputy Dobler stated that he understood he should not make assumptions. On the day of plaintiff's arrest, he couldn't recall if plaintiff's primary language had crossed his mind. He "just went with what was effective." Doc. 72-5 at 33 (Dobler Dep. 180:8–9). Corporal Beightel thinks plaintiff's primary language is English.

Both Deputy Dobler and Corporal Beightel know that the 911 dispatcher has resources and interpreters available for officers to use on calls. Deputy Dobler believes that if: (1) the scene is safe and (2) time isn't an issue, then it is appropriate to call the dispatcher when a communication barrier exists. Deputy Dobler explained that he would defer to the dispatcher to get help if he experienced a problem communicating with someone at the scene. Corporal Beightel believes that if he responds to a call and he cannot communicate effectively there, he can call and ask for a translator. Corporal Beightel also knows that he should not use family members to translate at the scene of a call.

When a person involved at the scene of a response to a 911 call does not speak English, Deputy Dobler uses his common sense. He uses the Topeka Police Department for translation with Spanish-speaking individuals. Corporal Beightel has no training about working with non-English speaking individuals.

Both Deputy Dobler and Corporal Beightel do not recall any training about working with hearing-impaired citizens. Before dealing with plaintiff in April 2015, Deputy Dobler testified, initially, that he never had dealt with a deaf person in his work as a deputy. But later, he recalled one traffic encounter with someone he knew from his childhood. He said he knew that person

was deaf.  Deputy Dobler does not have an understanding nor has he received training about the requirements of Title II of the ADA.

Defendants have received just one other complaint in the last 10 years asserting that they failed to accommodate a disabled inmate.  They received it on October 26, 2016—after plaintiff filed this lawsuit.  The Kansas Human Rights Commission dismissed that complaint.

### G.    Shawnee County Sheriff's Department Arrest Report and Affidavits

Deputy Dobler and Corporal Beightel testified about the reports and affidavits they completed on the Hans call in April 2015.   Deputy Dobler explained that the reports contain errors due to the flaws in the reporting system and issues that arise when reports are merged and sent to Records.  Also, certain state requirements lead records clerks to provide information in the reports that the officers may not have entered.

Deputy Dobler believes that Corporal Beightel's narrative report provided an incorrect timeline and inaccurately recounted some statements.  Specifically, he believes the report failed to memorialize properly that Mr. Hans initially accused plaintiff of stomping on his hand intentionally.  Also, Corporal Beightel's affidavit reported that plaintiff said nothing about stepping on Mr. Hans's hand.  Deputy Dobler disagreed with this portion of the affidavit, testifying that plaintiff showed him and Corporal Beightel that she had stomped on Mr. Hans's hand.

Corporal Beightel conceded that his own report was incorrect in several places.  The report failed to mention the act of plaintiff "stomping" on Mr. Hans's hand.  And the report summarized some events in the wrong order.  When asked about the language in his affidavit, Corporal Beightel said that his description could "be worded better."  Doc. 72-6 (Beightel Dep. 99:25).

II.     **Legal Standard**

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."  *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof."  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to

affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at

670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327.

Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive

determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### III.    Analysis

Defendants argue they are entitled to summary judgment against all plaintiff's claims.

The court organizes its analysis of defendants' arguments in three sections. The first portion—

Part A, below—address plaintiff's claim under § 1983. The second part of the analysis—in part

B—takes up plaintiff's ADA claim. And last, Part C addresses plaintiff's three causes of action

relying on Kansas state law.

### A.    Section 1983 Claim

Plaintiff alleges that both defendants violated 42 U.S.C. § 1983 when their employees

wrongfully arrested her. Doc. 56 at 11 ¶ 8. "A plaintiff may recover damages under § 1983 for

wrongful arrest if she shows she was arrested without probable cause." *Cottrell v. Kaysville

City, Utah*, 994 F.2d 730, 733 (10th Cir. 1993). "Probable cause exists when the facts and

circumstances within the officers' knowledge, and of which they have reasonably trustworthy

information, are sufficient in themselves to warrant a man of reasonable caution in the belief that

an offense has been or is being committed and that the person . . . was involved in the crime."

*Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017). "The probable cause determination is based

on the totality of circumstances . . . and 'does not . . . require the suspect's guilt to be more likely

true than false.'" *Pinney v. City of Tulsa, Okla.*, No. 16-5171, 2017 WL 5643119, at *2 (10th

Cir. Nov. 24, 2017) (first citing *Florida v. Harris*, 568 U.S. 237, 244, (2013); then quoting

*Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014)).  "The question is whether a reasonable officer would have concluded that the [plaintiff] 'committed a crime.'"  *Id.* (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)).  The court reviews the facts as the officers knew them.  *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." (citation omitted)).

When the officers arrested plaintiff, Kan. Stat. Ann. § 21-5414 defined domestic battery as "(1) [k]nowingly or recklessly causing bodily harm by a family member or household member against a family or household member; or (2) knowingly causing physical contact with a family or household member by a family or household member when done in a rude, insulting or angry manner."

These principles merge with the legal standard for summary judgment.  When determining whether probable cause existed for the purportedly unlawful arrest, the court reviews "the facts known to the arresting officer at the time of the arrest."  *Alford*, 543 U.S. at 152.  And probable cause existed if those facts, viewed in "the totality of the circumstances," *Pinney*, 2017 WL 5643119, at *2, would lead "a man of reasonable caution" to believe "an offense has been committed."  *Patel*, 849 F.3d at 981.  When determining if summary judgment is warranted, the court views the facts "in the light most favorable to the non-moving party," *Nahno-Lopez*, 625 F.3d at 1283, to determine if a "genuine dispute" exists about "any material fact."  Fed. R. Civ. P. 56(c).

At bottom, these standards require the court to determine if probable cause existed for plaintiff's arrest by viewing the facts known to the arresting officers at the time they made the

arrest as judged by the totality of the circumstances.  The court must view these facts, of course, in the light most favorable to plaintiff.

So, defendants' motion requires the court to decide whether, on the summary judgment facts, a reasonable jury could find that defendants' employees lacked probable cause to arrest plaintiff on a domestic battery charge.  Or, to put a finer point on the governing question, could a reasonable jury find that a reasonable officer lacked a basis to conclude that plaintiff knowingly caused physical contact with a family or household member in a "rude, insulting, or angry manner?"  *See* Kan. Stat. Ann. § 21-5414.

It comes as no surprise that various witnesses' recollections about a domestic dispute involving a family member who had been drinking heavily comes with some factual differences.  But all the facts that govern the officers' probable cause determination are settled ones.  In short, none of the material facts are disputed.

For one, no one disputes that Mr. Hans was plaintiff's "family or household member."  This satisfies the first component of a charge under Kan. Stat. Ann. § 21-5414(2).  Likewise, no one disputes that plaintiff "knowingly caus[ed] physical contact" with Mr. Hans.  She has admitted as much.  She gestured to Deputy Dobler that she had pushed Mr. Hans.  Later, she reenacted something else she had done, showing how she had used the bottom of her foot to make contact with Mr. Hans.  A few seconds later, she reenacted the foot contact a second time; and she also demonstrated that she had used her hands to make contact with Mr. Hans.[6]

But plaintiff's admissions were not the only "facts and circumstances within the [arresting] officers' knowledge."  *Patel*, 849 F.3d at 981.  Nor were they the only "reasonably trustworthy information" the officers received before arresting plaintiff.  *Id.*  Mr. Hans confirmed

---

[6]    Plaintiff calls the contact with her foot a "push," while the officers viewed it as a kick.  But that distinction doesn't matter.  The operative portion of the Kansas statute criminalizing domestic battery merely requires "physical contact" made in a rude, insulting, or angry manner.

that plaintiff had pushed him and then, he asserted that plaintiff "had stomped" on his hand. And although Mr. Hans later retracted the stomping allegation, the officers observed visible injuries on the top of Mr. Hans's hand. Given the "totality of the circumstances," *Pinney*, 2017 WL 5643119, at *2, no reasonable jury could find that the defendants' employees lacked probable cause to believe plaintiff had "caus[ed] physical contact" with her family member.

This leaves just one more component of the probable cause analysis. Could the officers reasonably have concluded that plaintiff made contact with Mr. Hans in either a "rude, insulting, or angry manner?" Kan. Stat. Ann. § 21-5414(2). The summary judgment facts leave no room for dispute whether the officers had a reasoned basis for their determination on this front. Plaintiff and her husband both reported that they had engaged in a sufficiently serious disagreement that plaintiff elected to request law enforcement officers to come to the scene. And while a factfinder ultimately may have concluded that plaintiff's pushing and kicking was neither rude nor insulting nor angry, that is not what controls the probable cause analysis. As the Circuit has emphasized, probable cause exists when "reasonably trustworthy information" would lead an officer of "reasonable caution" to believe that plaintiff committed domestic battery. *Patel*, 849 F.3d at 981. No reasonable jury could find that Corporal Beightel and Deputy Dobler lacked probable cause to arrest plaintiff.

The court closes its analysis with two more observations about the summary judgment facts. First, the reasoned quality of the officer's conclusion later was confirmed by a Kansas state court judge. The parties all agree: Shawnee County, Kansas District Court Judge Kingfisher conducted a bond review and probable cause determination the day after plaintiff's arrest. The parties also agree Judge Kingfisher concluded that probable cause supported plaintiff's arrest. This judicial determination bolstered the officers' determination.

Finally, plaintiff contends that her § 1983 claim must survive summary judgment because the Kansas prosecutor decided not to prosecute plaintiff for domestic battery. This argument confuses two distinct analyses. As our Circuit has explained, "Since probable cause for a warrantless arrest is determined in terms of the circumstances confronting the arresting officer at the time of the seizure, the validity of such an arrest is not undermined by subsequent events in the suspect's criminal prosecution, such as dismissal of charges, or acquittal." *Summers v. State of Utah*, 927 F.2d 1165, 1166–67 (10th Cir. 1991). The court thus analyzes the circumstances at the time of plaintiff's arrest—not the ones that later controlled a district attorney's decision not to prosecute plaintiff.

For these reasons, the court finds that no reasonable jury could conclude that the two officers lacked probable cause to arrest plaintiff. Consequently, the court grants defendants summary judgment against plaintiff's § 1983 claim.[7]

### B.      ADA Claims

Plaintiff also asserts that both defendants violated Title II of the ADA by failing to accommodate her disability in eight different ways. They allegedly committed these violations by: (1) failing to provide the services of an appropriate response when she called 911 on April 3, 2015; (2) wrongfully arresting plaintiff; (3) improperly communicating with her during the intake process at the DOC and incorrectly subjecting her to suicide watch; (4) denying her access to an interpreter when she bonded out of the jail; (5) denying her access to a sign language interpreter for her meeting with Mary Herman, her Court Services Officer; (6) threatening plaintiff with re-arrest if she did not meet with Mary Herman, her CSO, despite denying her request for a sign language interpreter for the meeting; (7) failing to train their employees

---

[7]     Because the court reaches this conclusion, it does not address defendants' argument that a § 1983 claim against both defendants is redundant. *See* Doc. 65 at 21.

appropriately about how to comply with the ADA; and (8) failing to supervise their employees to ensure compliance with their own policies or the ADA. The court does not decide whether a genuine issue of material fact exists about plaintiff's ability to make a submissible case on these claims because the court determines that plaintiff cannot recover compensatory damages under Title II of the ADA without establishing intentional discrimination. And plaintiff has waived the opportunity to assert intentional discrimination by omitting that claim from the Pretrial Order. Also, even if plaintiff had not waived her right to assert this claim, she has failed to establish facts from which a reasonable jury could find that defendants intentionally discriminated against her.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To make a viable claim under Title II, a plaintiff must prove:

> (1) that he or she is a qualified individual with a disability;
> (2) that he or she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and
> (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016). "Based on the second element, courts have recognized two types of claims: (1) exclusion from or denial of benefits and (2) discrimination." *Id.* (citation omitted). "Courts have recognized three ways to establish a discrimination claim: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Id.* (citations omitted).

Here, all plaintiff's theories assert that defendants failed to make a reasonable accommodation. Out of the gate, defendants argue that plaintiff's reliance on their failure to

accommodate her disability affects her claim in two ways, and entitles them to summary judgment.  First, defendants argue, plaintiff has waived any claim of intentional discrimination and discrimination by disparate impact because she didn't include either of those claims in the Pretrial Order.  And second, plaintiff cannot recover compensatory damages under Title II of the ADA without showing intentional discrimination and she fails to show intentional discrimination.  The next four subsections analyze these arguments.

### 1.    Waiver

First, defendants contend, plaintiff is precluded from asserting intentional discrimination or discrimination through disparate impact.  For this argument, defendants solely rely on *J.V. v. Albuquerque Public Schools*.

In this case, our Circuit affirmed a district court's decision to grant summary judgment because plaintiffs had waived a disparate impact argument by failing to include it in their Complaint.  *Id.* at 1299.  The district court decided to grant defendant summary judgment because first, plaintiffs had waited until they filed their response to defendant's motion for summary judgment before asserting that defendant's conduct was discriminatory because it had a disparate impact on disabled children.  *J.V. on behalf of C.V. v. Albuquerque Pub. Sch.*, No. CV 13-01204 MV/KBM, 2015 WL 13333013, at *6 (D.N.M Mar. 27, 2015).  The court also granted summary judgment because plaintiffs had failed to adduce any evidence that a policy of defendant had caused a disparate impact on disabled children.  *Id.*

When plaintiffs appealed this decision, the Circuit summarized the district court's ruling as one:  determining that plaintiffs waived their disparate impact claim because they had failed to include it in their Complaint and, separately, plaintiff had failed to raise a genuine issue of

material fact about disparate impact.  *Albuquerque Pub. Sch.*, 813 F.3d at 1299.  The Circuit

agreed with the district court's decision on both fronts.  *Id.*

In this case, defendants argue that *Albuquerque Public School* means plaintiff waived her

ability to allege intentional discrimination and discrimination by disparate impact by omitting

those claims from the Pretrial Order.  Plaintiff does not respond to this argument directly.

Instead, much like plaintiffs in *Albuquerque Public School*, she argues that the record before the

court is sufficient to establish intentional discrimination through deliberate indifference as well

as discrimination through disparate impact.  In other words, she turns directly to the merits of

those two claims.  But before the court addresses plaintiff's arguments about deliberate

indifference and disparate impact, it must decide the waiver issue.

Before *Albuquerque Public School*, the Tenth Circuit determined that failure to allege

intentional discrimination in the Pretrial Order constitutes waiver of that theory.  *See Tyler v.*

*City of Manhattan*, 118 F.3d 1400, 1404 (10th Cir. 1997).  In *Tyler*, after issuing the Pretrial

Order, our court—on its own motion—determined that it had to amend that order under Fed. R.

Civ. P. 16(e) and 39(a)(2).  *Tyler v. City of Manhattan*, 849 F. Supp. 1442, 1443 (D. Kan. 1994).

Plaintiff's Complaint alleged, in three counts, that defendant violated the ADA.  The court

already had granted defendant summary judgment against Count III so two counts remained.

Count II was the focus of the court's analysis.  It alleged that defendant "ha[d] subjected plaintiff

to discrimination by failing to carry out its obligations to permit him to participate equally in its

services, activities, and programs, in particular its recreational programs, city council meetings,

and advisory board activities."  *Id.*  "Under the pretrial order, plaintiff's claims of discrimination

under Count II would be tried to a jury.  In addition, plaintiff claims $50,000 in compensatory

damages for '[m]ental anguish and humiliation, embarrassment and denial of his right of

participation.'"  *Id.*  *Tyler* conducted an analysis of compensatory damages under Title II of the ADA, which this court will discuss in further detail in subsection 4, below.  For now, it is sufficient to note that *Tyler* concluded "that the ADA does not provide plaintiff a right to a jury trial or to his claimed compensatory damages on Count II" because he had failed to allege intentional discrimination in the Pretrial Order.  *Id.*  At bottom, plaintiff's failure to allege intentional discrimination in the Pretrial Order led the court to strike plaintiff's claim for compensatory damages.  *Id.* at 1445.

On appeal, the Circuit described the district court's determinations in this fashion:  "The district court ruled that compensatory damages for mental and emotional injury were not available under the ADA absent intentional discrimination.  The district court further concluded that [plaintiff] had not claimed he was subjected to intentional discrimination."  *Tyler*, 118 F.3d at 1401.  The Circuit agreed with the district court that the Pretrial Order did not allege intentional discrimination so it affirmed the district court's order striking plaintiff's claim for compensatory damages.  *Id.* at 1404.  In effect, the Tenth Circuit has established that an ADA plaintiff waives an intentional discrimination theory if he fails to assert that theory in the Pretrial Order.

In sum, our Circuit generally has held that if plaintiff fails to allege a theory of discrimination under the ADA in the Complaint or Pretrial Order, whichever is operative, plaintiff waives that theory of liability.

Here, because the court has issued the Pretrial Order, it is the operative document.  Fed. R. Civ. P. 16(d) ("[The Pretrial Order] controls the course of action . . . .");  D. Kan. Rule 16.2(b) ("The pretrial order . . . will control the subsequent course of the action . . . .");  Doc. 56 at 1 ("This pretrial order supersedes all pleadings and controls the subsequent course of this case.").

In the Pretrial Order, plaintiff's ADA claims assert that defendants "failed to accommodate" plaintiff in some way. *Id.* at 9–11 ¶¶ 1–3, 5–7, 9–10. But she never asserts a claim for intentional discrimination or discrimination by disparate impact. And in her response to defendants' argument, plaintiff never contends that she did assert discrimination under either of these theories.

The court finds that plaintiff has alleged ADA discrimination based on failure to accommodate, but she has not presented a claim for intentional discrimination or discrimination through disparate impact in the Pretrial Order. For this reason, the court concludes that plaintiff has waived the opportunity to argue intentional discrimination or discrimination through disparate impact.

## 2. Intentional Discrimination

Even if plaintiff had not waived these two theories of recovery, she has failed to establish a genuine issue of material fact requiring a trial on either theory. "[I]ntentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Albuquerque Pub. Sch.*, 813 F.3d at 1298 (internal quotation marks and citations omitted). "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id.* (internal quotations marks, alteration, and citation omitted). "The failure to act must be more than negligent and [it must] involve an element of deliberateness." *Id.* (internal quotation marks and citation omitted). Here, plaintiff asserts defendants intentionally discriminated against her by failing to provide an ASL interpreter and failing to train their employees.

### a.    Failure to Provide ASL interpreter

Plaintiff first asserts that "from the time the deputies arrived on the scene until the time she was released from jail, she was denied the ability to communicate." Doc. 72 at 75. Plaintiff alleges that defendants' employees deprived her this right by failing to provide a sign language interpreter.

Federal regulations require public entities to "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). In pursuit of effective communications, public entities must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." *Id.* § 35.160(b)(1). Auxiliary aids and services include, "[q]ualified interpreters on-site or through video remote interpreting (VRI) services; . . . written materials; exchange of written notes; . . . text telephones (TTYs) . . . or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing." *Id.* § 35.104(1). A qualified interpreter on-site is just one of the options available to public entities.

No bright line rule defines essential steps required to establish effective communication with a hearing-impaired person; instead the inquiry is a fact-specific one. *See Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1087 (11th Cir. 2007). "In many circumstances, oral communication plus gestures and visual aids or note writing will achieve effective communication. In other circumstances, an interpreter will be needed." *Bircoll*, 480 F.3d at 1087. At bottom, the quality of communication between a hearing-impaired person and a police officer does not have to be "perfect" to place the hearing-impaired person "on equal footing"

with non-disabled people. *Silva v. Baptist Health S. Florida, Inc.*, 856 F.3d 824, 835 n.7 (11th Cir. 2017) (citing *Bircoll*, 480 F.3d at 1086). But the communication technique *must* be effective. *Id.* (emphasis added).

Here, plaintiff has failed to establish any facts which could permit a reasonable jury to find that defendants were deliberately indifferent to a strong likelihood that its policies would cause ineffective communication. First, plaintiff fails to identify to any specific policy of defendants creating such a likelihood. But more importantly, she fails to establish facts capable of supporting her bald assertion that "she was denied the ability to communicate." Doc. 72 at 75.

The summary judgment record shows that during plaintiff's arrest, Corporal Beightel and Deputy Dobler communicated with plaintiff using a combination of written notes, gestures, and verbal utterances. These methods achieve effective communication in many circumstances. *See Bircoll*, 480 F.3d at 1087. During screening at the DOC, Officer Hutting used written materials to complete the intake questions with plaintiff. To complete the suicide screening, Sergeant Anderson used a form displayed on a computer screen, and he used written notes. These techniques permitted him to learn that plaintiff had been admitted for psychiatric treatment at Valeo. These same techniques enabled Sergeant Anderson to identify plaintiff's current medications. The methods used by DOC officers constituted the auxiliary aids, or slight variations of them, identified in 28 C.F.R. § 35.104(1).

Once in her cell, plaintiff communicated effectively with DOC personnel by gesturing requests for toilet paper and water. And jail personnel provided her with both items she requested. These attempts to communicate show no deliberate indifference to effective communication. Instead, they demonstrate attempts by defendants' employees to communicate effectively with plaintiff. And although plaintiff claims "she was denied the ability to

communicate," she has failed to come forward with any evidence that she was unable to communicate with defendants' employees. Defendants' failure to provide a sign language interpreter does not constitute deliberate indifference because defendants' employees effectively used other methods of communication to communicate effectively with plaintiff. And from these summary judgment facts, no reasonable jury could find that defendants were deliberately indifferent to a strong likelihood that its policies would cause ineffective communication.

Plaintiff next asserts that on September 25, 2015, "[r]ather than provide any accommodation, the Defendants were satisfied with no accommodation." Doc. 72 at 58. Again, plaintiff fails to support her argument with any proof of a specific policy of defendants that created a strong likelihood of ineffective communication. *See Albuquerque Pub. Sch.*, 813 F.3d at 1298. Also, the summary judgment facts do not show that defendants failed to provide any accommodation. In fact, they establish the opposite. Plaintiff contacted and communicated with the 911 dispatcher using a video relay service. The dispatcher responded, saying she would send a deputy to plaintiff's location. Plaintiff chose, however, to meet with a deputy at the police station. Plaintiff offered to use her phone's video relay service once she arrived at the station. And later in the conversation, the dispatcher confirmed that plaintiff could use the video relay service once she arrived there. The summary judgment record, even when viewed in plaintiff's favor, does not show that defendants failed to provide an accommodation, much less, that such a failure constituted deliberate indifference by defendants.

**b.      Failure to Train**

Plaintiff also contends that "not a single one of the Defendants' employees involved in this case had training on working with the hearing impaired." Doc. 72 at 58. "When the alleged failure to act is an alleged failure to train, [the Tenth Circuit] ha[s] required a showing that the

defendant was on notice of the need for more or different training." *Albuquerque Pub. Sch.*, 813 F.3d at 1298 (internal quotation marks and citation omitted). The Circuit's rule relies on decisions under § 1983 to address failure-to-train ADA claims. *Id.* Those decisions require the ADA plaintiff to show "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 397 (1989)).

In *Albuquerque Public Schools*, the Circuit found that plaintiffs there had failed to show deliberate indifference based on lack of training for three reasons. Those reasons were a failure to show: (1) defendant was on notice of the need for more or better training because plaintiffs did not identify a single other incident before the one at issue; (2) defendant's lack of training was more than negligent, *i.e.*, contained an element of deliberateness; and (3) defendant knew that its failure to train made harm to a federally protected right substantially likely. *Id.* Because plaintiff had failed to establish any one of these forms of deliberate indifference, the Circuit affirmed the district court's order granting summary judgment against plaintiff's claims.

Here, plaintiff fails to adduce any evidence which could permit a reasonable jury to find deliberate indifference based on a lack of training. Plaintiff simply asserts that defendants knew they would encounter hearing-impaired citizens, but they pretended like deaf people don't exist. Trying to support this assertion, plaintiff asserts that defendants had failed to establish a standard method for its employees to work with hearing-impaired citizens. Instead, defendants' employees used their own individual methods to communicate. But just like the plaintiffs in *Albuquerque Public Schools*, plaintiff can identify no other incident involving deaf people that preceded her arrest. Indeed, no such incident has occurred in the last 10 years. Also, plaintiff

41

has failed to establish deliberateness, or that defendants knew that a lack of training would lead to ineffective communication with hearing-impaired individuals. In sum, plaintiff has failed to adduce any evidence that would permit her to make a claim for deliberate indifference through lack of training.

### 3. Disparate Impact

Plaintiff also alleges that defendants' policies "created a disparate impact on hearing impaired citizens such as Plaintiff." Doc. 72 at 57. "Unlike a claim for disparate treatment, a claim for disparate impact doesn't require proof of intentional discrimination." *Albuquerque Pub. Sch.*, 813 F.3d at 1298 (internal quotation marks and citations omitted). Instead, to "prove a case of disparate impact discrimination, the plaintiff must show that a specific policy caused a significant disparate effect on a protected group." *Id.* (internal quotation marks and citation omitted). "This is generally shown by statistical evidence involving the appropriate comparables necessary to create a reasonable inference that any disparate effect identified was caused by the challenged policy and not other causal factors." *Id.* (internal quotation marks and citation omitted). "Moreover, a disparate impact claim must allege a pattern or practice of discrimination, not merely an isolated instance of it." *Id.* (citation omitted).

The summary judgment record contains no facts capable of supporting a disparate impact theory. Plaintiff's response to this part of defendants' motion simply asserts disparate impact, but never identifies any admissible evidence that can support her allegation. This is not sufficient; saying that something is so is no substitute for admissible evidence. And so, the court determines that no reasonable jury could conclude from the summary judgment facts that defendants' policies created a disparate impact.

In sum, the summary judgment facts present no genuine issue of fact requiring a trial of plaintiff's discrimination claim through deliberate indifference or disparate impact. So even if plaintiff had not waived these theories by omitting them from the Pretrial Order, defendants would be entitled to summary judgment against them.

### 4.     Compensatory Damages

Defendants next argue that plaintiff's omission from the Pretrial Order disposes of another issue. Namely, they argue that plaintiff cannot prevail on a claim for compensatory damages under the ADA without a showing of intentional discrimination. Other circuits explicitly have ruled on this issue. *See McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1146–47 (11th Cir. 2014) ("To prevail on a claim for compensatory damages under either the [Rehabilitation Act] or the ADA, a plaintiff must show that a defendant violated his rights under the statutes and did so with discriminatory intent." (citations omitted)); *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 126 (1st Cir. 2003) ("[P]rivate individuals may recover compensatory damages under § 504 and Title II [of the ADA] only for intentional discrimination."); *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002) ("A plaintiff asserting a private cause of action for violations of the ADA or the [Rehabilitation Act] may only recover compensatory damages upon a showing of intentional discrimination." (citation omitted)); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) ("To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant." (citation omitted)).

Our Circuit has not yet decided this issue. But on other ADA issues, it has "look[ed] to decisions construing the Rehabilitation Act to assist [it] in interpreting analogous provisions of the ADA." *See, e.g.*, *Albuquerque Pub. Sch.*, 813 F.3d at 1298 n.6. And the Circuit has held,

"To recover compensatory damages under § 504 [of the Rehabilitation Act], a plaintiff must establish that the agency's discrimination was intentional." *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) (citation omitted).  Also, a district court in our Circuit has interpreted one of the Tenth Circuit's decisions "to require a showing of intentional discrimination before a plaintiff may recover compensatory damages for mental or emotional injury [under Title II of the ADA]."  *Ulibarri v. City & Cty. of Denver*, 742 F. Supp. 2d 1192, 1212 (D. Colo. 2010) (citing *Tyler*, 118 F.3d at 1403–04).

### a.  *Robertson v. Las Animas County Sheriff's Department*

Plaintiff correctly argues that none of this precedent is binding on the court.  Instead, she asserts, *Robertson v. Las Animas County Sheriff's Department*, 500 F.3d 1185 (10th Cir. 2007) controls the court's decision.  And it stands for the proposition, she argues, that the Tenth Circuit does not require intentional discrimination for a claim for compensatory damages under the ADA to survive summary judgment.

In *Robertson*, a hearing-impaired plaintiff claimed that defendants "violated Title II of the ADA by not providing him with telephone services while he was imprisoned and by not allowing him to participate in his probable cause hearing."  500 F.3d at 1190.  He sought both compensatory and punitive damages based on this claim.  The district court granted summary judgment against plaintiff, concluding:  "[plaintiff] is not a 'qualified individual with a disability' within the meaning of the ADA, and, even if he were, he did not establish that he was denied the benefits of a public entity's services, programs, or activities."  *Id.*

The Circuit reversed.  *Id.* at 1200.  It held that there were genuine issues of material fact.  They included a dispute whether plaintiff was disabled within the meaning of the ADA, whether the detention facility knew about plaintiff's disability, and whether the detention facility knew an

accommodation was necessary to enable plaintiff to participate in its services to the same extent as a non-disabled prisoner. *Id.*

Defendants counter plaintiff's reliance on *Robertson*, noting correctly that plaintiff sought declaratory relief and compensatory damages based on his failure to accommodate claim. The court agrees with defendants. *Robertson* presented a different set of claims than plaintiff presents in her case, and that distinction matters. Also, the issue before the Circuit on appeal was whether plaintiff was a qualified individual with a disability within the meaning of the ADA. *Id.* at 1190. *Robertson*'s parties did not contest the question whether compensatory damages required a showing of intentional discrimination.

The court cannot discern, with certainty, whether the Circuit reversed because intentional discrimination is not required to recover compensatory damages (as plaintiff argues) or, instead, because the *Robertson* plaintiff was requesting declaratory judgment (as defendants argue). But, declaratory relief is a separate remedy from compensatory damages, which could have justified the *Robertson* claim surviving summary judgment. *See Tyler*, 849 F. Supp. at 1445 (allowing plaintiff to seek declaratory and injunctive relief under the ADA even though the court struck plaintiff's claim for compensatory relief from the Pretrial Order). The court concludes that the presence of a claim for declaratory relief differentiates *Robertson* from the current case before the court.

### b.    Tenth Circuit interprets ADA claims by borrowing language from § 504

This distinction is significant because several things favor the conclusion that the Tenth Circuit would require a showing of intentional discrimination to support a claim trying to recover damages under Title II of the ADA. First, our Circuit interprets ADA claims by using an approach similar to the one used by other Circuits who expressly have required intentional

discrimination, *i.e.*, borrowing language from § 504 of the Rehabilitation Act. The First Circuit

described how it concluded that compensatory damages are available under Title II of the ADA

but only for intentional discrimination:

> *Alexander v. Sandoval*, 532 U.S. 275 (2001), holds that compensatory damages
> are available under Title VI only for intentional discrimination. *Id.* at 280–81
> (citing *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582 (1983)). Section
> 504 of the Rehabilitation Act and Title II of the ADA borrow their remedies from
> Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq. See* 42 U.S.C.
> § 12133 (Title II of the ADA borrows remedies from the Rehabilitation Act); 29
> U.S.C. § 794a(a)(2) (Rehabilitation Act borrows remedies from Title VI).

*Nieves-Marquez*, 353 F.3d at 127 n.20.

When the Ninth Circuit reached the same conclusion two years earlier, it also began with

Title VI, reasoning that "Title II and § 504 are expressly linked to Title VI." *Ferguson v. City of

Phoenix*, 157 F.3d 668, 673–74 (9th Cir. 1998). At that time, the Ninth Circuit didn't have the

benefit of *Alexander*'s holding so it relied on *Guardians*. In doing so, it reached the same

conclusion as the First Circuit—"compensatory damages are not available under Title II or § 504

absent a showing of discriminatory intent." *Id.* at 674. The Fifth Circuit reached the same

conclusion for the same reasons. *See Delano–Pyle*, 302 F.3d at 574; *see also Carter v. Orleans

Parish Pub. Sch.*, 725 F.2d 261, 264 (5th Cir. 1984).

Plaintiff tries to rebut these holdings by citing a law review article that asserts that courts

should not impose intent requirements on claims under Title II and § 504. *See* Mark C.

Weber, *Accidentally on Purpose: Intent in Disability Discrimination Law*, 56 B.C. L. Rev. 1417

(2015). The article's author submits that courts have paid "insufficient attention to *Alexander v.

Choate*, [469 U.S. 287 (1985),] *Alexander v. Sandoval*, *Barnes v. Gorman*, [536 U.S. 181

(2002),] statutory text and legislative history, and the policy considerations." *Id.* at 1464.

"[R]ather than reflexively dismissing cases for lack of proof," he asserts, "courts must engage in

the hard task of determining whether reasonable accommodations have been denied and what relief is appropriate." *Id.*

Although the article makes some well-reasoned arguments, the court does not find its conclusion persuasive. Plaintiff has provided nothing to suggest that courts have adopted the article's proposition, or that the Supreme Court believes lower courts are misapplying its earlier opinions. Indeed, the Supreme Court has had at least two opportunities to redirect the law if it believed that redirection was necessary. Both times, it declined to do so. *See Delano–Pyle v. Victoria Cty.*, 302 F.3d 567, *cert. denied*, 540 U.S. 810 (2003); *Ferguson v. City of Phoenix*, 157 F.3d 668, *cert. denied*, 526 U.S. 1159 (1999). The court thus finds no reason to dispense the intent requirement that other Circuits have applied.

As discussed, the Tenth Circuit uses decisions under the Rehabilitation Act to interpret the ADA. *See Albuquerque Pub. Sch.*, 813 F.3d at 1298 n.6. This is the approach used by other Circuits who have concluded that compensatory damages are available under Title II of the ADA but only for intentional discrimination claims. In a recent decision affirming this approach, the Tenth Circuit cited a Ninth Circuit case that expressly required a plaintiff to prove intentional discrimination to recover monetary damages under Title II of the ADA. *Albuquerque Pub. Sch.*, 813 F.3d at 1298 n.6 (citing *Duvall*, 260 F.3d at 1138).

### c.    *Tyler v. City of Manhattan*

Although our Circuit has not addressed this issue squarely, it has come close. In 1994, this court held that compensatory damages for mental and emotional injury were not available under Title II of the ADA without a showing of intentional discrimination. *Tyler*, 849 F. Supp. at 1443. After the court found that plaintiff had not alleged intentional discrimination in the Pretrial Order, it struck plaintiff's compensatory damages claim. *Id.* at 1245. Plaintiff appealed.

On appeal, plaintiff argued that he was subjected to intentional discrimination. *Tyler*, 118 F.3d 1400 at 1401.  But he never contended that Title II of the ADA does not require intentional discrimination to support a claim for compensatory damages.  Instead, the United States raised this issue *amicus curiae*.  *Id.* at 1403.  The Circuit, exercising its discretion, elected not to address the government's argument.  *Id.* at 1404.  Instead, the court found that the Pretrial Order did not allege intentional discretion and affirmed the district court's decision.  *Id.*

The District of Colorado court has interpreted the Circuit's affirmation "to require a showing of intentional discrimination before a plaintiff may recover compensatory damages for mental or emotional injury [under Title II of the ADA]."  *Ulibarri*, 742 F. Supp. 2d at 1212 (citing *Tyler*, 118 F.3d at 1403–04).  While the court does not agree that our Circuit has resolved this question explicitly, it does agree that the outcome in *Tyler* signals an approval—albeit implicitly—of our court's holding in *Tyler* that compensatory damages for mental and emotional injury were not available under Title II of the ADA without intentional discrimination.

Taken together, these factors persuade the court to predict that our Circuit—if presented with the issue—would require intentional discrimination to recover compensatory damages under Title II of the ADA.  Because the summary judgment facts present no basis to sustain a claim for intentional discrimination, defendants are entitled to summary judgment on plaintiff's compensatory damages claims under the ADA.  Because plaintiff seeks no other remedy under the ADA, Doc. 56 at 13 (requesting compensatory damages as relief for ADA claim but no other type of damages), defendants are entitled to summary judgment against all plaintiff's ADA claims.

### C.    Kansas State Law Claims

Last, plaintiff alleges that defendants committed various torts recognized by Kansas state law.  In short form, she claims that defendants' employees falsely arrested her and inflicted emotional distress on her, and defendants, themselves, negligently trained and supervised their employees.  Doc. 56 at 11–12 ¶¶ 11–13.  The following three subsections address these tort claims.

#### 1.    False Arrest

Plaintiff's first state law claim relies on the tort known as false arrest or, sometimes, false imprisonment.  "'False arrest' is the restraint of the personal freedom of an individual without legal excuse by any words, acts, threats, or personal violence that under the circumstances the one being restrained fears to disregard."  *Soto v. City of Bonner Springs*, 166 P.3d 1056, 1059 (Kan. Ct. App. 2007).  Defendants argue they are entitled to summary judgment against this claim for two distinct reasons.

*First*, defendants say, the claim fails as a matter of law because defendants' officers had probable cause to arrest plaintiff for domestic battery.  "To prevail on [a] false arrest and imprisonment claim, [plaintiff] is required to prove [that she] was intentionally restrained, confined, or arrested without justification or legal excuse."  *Spillman v. Stanton*, 335 P.3d 710, 2014 WL 4996185, at *3 (Kan. Ct. App. Oct. 3, 2014) (citing *Thompson v. Gen. Fin. Co.*, 468 P.2d 269, 279–80 (Kan. 1970)).  Kansas law permits a law enforcement officer to arrest a person—and thus legally justifies the restraint, confinement, or arrest of that person for purposes of a false arrest claim—if the officer had probable cause to believe that the person is committing or has committed a misdemeanor.  *Id.*; *see* Kan. Stat. Ann. § 22-2401(c)(2); *see also Mendoza v.*

*Reno Cty.*, 681 P.2d 676, 678 (Kan. 1984).  Kansas law recognizes domestic battery as a class B person misdemeanor.  Kan. Stat. Ann. § 21-5414(c)(1)(A).

No dispute exists about some aspects of this claim.  For example, everyone agrees that officers intentionally arrested plaintiff.  That much is undisputed.  So summary judgment turns on whether they had legal justification to arrest plaintiff.  The court already has concluded that no reasonable jury could find that defendants' officers lacked probable cause to arrest plaintiff for domestic battery.  Under Kansas law, an officer has legal justification to arrest a person for a misdemeanor if he has probable cause to believe that person has committed a misdemeanor.  *See Spillman*, 2014 WL 4996185, at *3; Kan. Stat. Ann. §§ 22-2401(c)(2) & 21-5414(c)(1)(A). Given the court's earlier conclusion that probable cause existed, the court now concludes that no reasonable jury could find that defendants' officers lacked legal justification to arrest plaintiff. This conclusion excludes any possibility that plaintiff could establish an essential element of her claim and thus makes summary judgment proper.

*Second*, defendants argue that the "enforcement of law" exception in the Kansas Tort Claims Act ("KTCA") protects them from liability.  This exception in the KTCA provides, "A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from . . . enforcement of or failure to enforce a law, whether valid or invalid, including but not limited to, any statute, rule and regulation, ordinance or resolution."  Kan. Stat. Ann. § 75-6104(c).  Naturally, "[i]f the actions of a government entity or employee are outside the purview of the statute, regulation, ordinance or resolution, however, the exception contained in 75-6104(c) is inapplicable."  *Allen v. Bd. of Comm'rs of Cty. of Wyandotte*, 773 F. Supp. 1442, 1455 (D. Kan. 1991) (citation omitted).

In *Allen*, our court granted summary judgment against false and negligent imprisonment claims based on the KTCA's "enforcement of law" exception.  *Id.* at 1455.  In that case, the court found that defendants had arrested plaintiff for violating Kansas law by driving on a suspended license.  The court determined that there was no evidence capable of supporting a finding that defendants acted outside the scope or purview of Kansas law.  So, the court concluded, defendants were acting to enforce state law and thus granted summary judgment against the false imprisonment claim.  *Id.*

Based on the conclusions the court already has reached on the summary judgment motion, the court holds the summary judgment facts establish that defendants' officers were enforcing the Kansas state law criminalizing domestic battery when they arrested plaintiff.  Because she has adduced no admissible evidence suggesting a genuine issue of material fact exists, defendants' officers, as a matter of law, did not act outside the scope of Kansas law.  So, they qualify for the "enforcement of law" exception to the KTCA.  This determination provides a second reason to grant defendants summary judgment against this claim.

## 2.    Tort of Outrage

Next, plaintiff claims that "Defendants' employees inflicted emotional distress on Plaintiff in violation of Kansas tort law."  Doc. 56 at 12 ¶ 13.  Kansas law commonly calls this claim the tort of outrage.  *See Valadez v. Emmis Commc'ns*, 229 P.3d 389, 394 (Kan. 2010) ("In Kansas, the tort of outrage is the same as the tort of intentional infliction of emotional distress.").  To prevail on this claim, a plaintiff must prove four elements:  (1) the defendants' conduct "was intentional or in reckless disregard of the plaintiff;" (2) the conduct was "extreme and outrageous;" (3) a causal connection exists between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress was "extreme and severe."  *Id.*  "It is only

where the distress is 'extreme' or 'severe' that liability arises." *Id.* at 395.  Defendants are

entitled to summary judgment against this claim for two reasons.

*First*, this claim relies on vicarious liability to try to attach the deputies' conduct plaintiff

complains about to the two defendants she has sued.  Plaintiff's response to the summary

judgment motion concedes as much.  *See, e.g.*, Doc. 72 at 64 ("There is no question [plaintiff]

meets all of the requirements necessary to assert a claim against [Shawnee] County and its

employees for the outrageous conduct *of the deputies* in arresting, detaining and jailing her, as

the victim." (emphasis added)).  This assertion replicates the vicarious liability used by the

plaintiff in *Bolden v. PRC, Inc.*, 43 F.3d 545 (10th Cir. 1994).

In that case, the plaintiff sued his employer and his "immediate supervisor" for

outrageous behavior allegedly imposed on by his co-workers.  *See Bolden*, 43 F.3d at 553; *see

also id.* at 548 (identifying Mr. Carver as plaintiff's "immediate supervisor").  The district court

granted summary judgment against the claim and the Tenth Circuit affirmed.  The Circuit

explained the key to its reasoning in this fashion:  plaintiff "has failed to bring to this court's

attention any Kansas tort of outrage case in which any employer was held liable for the

outrageous conduct of an employee." *Bolden*, 43 F.3d at 554.

The plaintiff's claim here suffers the same problem.  She never asserts that the case's two

defendants—the Board of County Commissioners for Shawnee County, Kansas and the Sheriff

of the County—did something outrageous themselves.  *See* Doc. 72 at 64 (suing for "outrageous

conduct of deputies");  *see also* Doc. 56 (Pretrial Order) at 1 (identifying neither Deputy Sheriff

as a defendant).  In short, plaintiff's case aligns with the outrage claim rejected by *Bolden*.  And

like the *Bolden* plaintiff, plaintiff here "has failed to bring to this court's attention any Kansas

tort of outrage case" where an employer or a supervisor "was held liable for the outrageous

52

conduct of an employee." *See Bolden*, 43 F.3d at 554. The court thus concludes it should impose the same outcome as *Bolden*—summary judgment.

*Second*, even if plaintiff had established that defendants could be vicariously liable for their employees' conduct, she also has failed to adduce any evidence capable of supporting a finding of extreme and outrageous conduct. For "[c]onduct to be a sufficient basis for an action to recover for emotional distress [it] must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." *Roberts v. Saylor*, 637 P.2d 1175, 1179 (Kan. 1981). "[M]ere insults, indignities, threats, annoyances, petty expressions, or other trivialities" are not enough. *Id.*

Plaintiff utterly defaults on her obligation to adduce evidence of such conduct. Her response to the summary judgment never identifies admissible evidence of conduct that exceeded "the bounds of decency and is utterly intolerable in a civilized society." *See id.* She tries to discharge her burden with argument—calling the deputies' conduct "abhorrent and extreme." Doc. 72 at 64. Spirited rhetoric is no substitute for admissible evidence of facts.

Our Circuit has explained the kind of behavior that can satisfy this qualitative element of Kansas law. It noted that the Kansas Court of Appeals had affirmed a plaintiff's verdict on an outrage claim in a case where "the employer" had "subjected the employee to vulgar, racist expressions and threats of violence" that "result[ed] in possibl[y] serious medical problems." *Bolden*, 43 F.3d at 554 (describing *Gomez v. Hug*, 645 P.2d 916 (Kan. Ct. App. 1982)). The Circuit also referenced *Laughinghouse v. Risser*, 754 F. Supp. 836 (D. Kan. 1990), a case where this court denied summary judgment against an outrage claim. In that case, the defendant—the plaintiff's supervisor—had engaged in "a concerted effort to terrorize [plaintiff] and to intentionally break her spirit." *Laughinghouse*, 754 F. Supp. at 843. The court reasoned that the

53

nature of the abuse and its "constancy" provided a basis capable of supporting a jury finding for plaintiff. *Id.* at 844.

The summary judgment facts here fall far short of either *Gomez* or *Laughinghouse*. Plaintiff asserts that two deputies arrested her and placed her in custody without adequate probable cause. Even if this were so—and the court has concluded it is not—this is not the kind of conduct that can support a Kansas outrage claim. The court grants summary judgment against the claim for this additional reason.

### 3.    Negligent Training and Negligent Supervision

Finally, plaintiff alleges that both defendants are liable for negligent training and supervision.[8] "A claim based on negligent training depends upon establishing facts showing that more or better training would have prevented the harm." *Estate of Belden v. Brown Cty.*, 261 P.3d 943, 968 (Kan. 2011).

Initially, defendants' argument for summary judgment against the negligent training claim is a simple one: "[Plaintiff] has not explained what additional training should have been provided and how it would have made any difference in this case." Doc. 65 at 45. Plaintiff responds, claiming that "any" training could have prevented her wrongful arrest. Doc. 72 at 60. She notes that both Corporal Beightel and Deputy Dobler had received no training about working

---

[8]    Defendants claim it is difficult to ascertain the gravamen of plaintiff's negligence claim. Doc. 65 at 43. But they interpret plaintiff's allegations to assert three theories of liability. One of those theories is a combination of negligent training and negligent supervision. Defendants then make summary judgment arguments against all three theories they apprehend in the Pretrial Order. Doc. 65 at 43–45. In her Opposition to the summary judgment motion—Doc. 72—plaintiff responds only to defendants' arguments attacking the negligent training and negligent supervision theory. Doc. 72 at 62–64. From this confusing set of circumstances, the court concludes that plaintiff only makes a negligent training and supervision claim. And even if she had asserted the two other theories, she has abandoned them by not responding to defendants' summary judgment arguments on them. *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768–69 (10th Cir. 2001) (affirming district court's ruling that plaintiff abandoned claim by failing to address it in response to motion for summary judgment); *see also Maestas v. Segura*, 416 F.3d 1182, 1190 n.9 (10th Cir. 2005) (finding plaintiffs abandoned claims by failing to "seriously address" them in their appellate brief).

with hearing-impaired individuals.  She argues that any training would have better prepared the officers to handle the challenges of communicating with a hearing-impaired citizen.  *Id.* at 62.  Plaintiff also asserts that defendants knew or should have known that they were setting their deputies and corrections officers up to fail by not providing them any ADA training or training on hearing-impaired citizens.  *Id.*  And although the precise nature of the harm need not be foreseeable, plaintiff contends, her harms were foreseeable to defendants.  *See id.* at 62–63 (citing *Kansas State Bank & Tr. Co. v. Specialized Transp. Servs., Inc.*, 819 P.2d 587, 598 (Kan. 1991) (finding that for an employer to be liable on a negligent supervision claim, it is not necessary that the employer should have foreseen the precise nature of the injury alleged by plaintiff)).

Defendants reply, arguing that no amount of training would have produced a different outcome here.  They contend that they had no obligation to provide a sign language interpreter.  And even if they had provided an interpreter skilled in ASL, plaintiff has not demonstrated how it would have changed the facts that led to the probable cause determination, her arrest, or the reasonableness of placing her on suicide watch.  While plaintiff responds that any training on the ADA or hearing-impaired citizens could have prevented her harm, she fails to adduce any evidence providing a basis for a jury finding that what she argues is so.  She also fails to define the harm she allegedly faced.

Rather than speculate about plaintiff's claims, the court decides the claims plaintiff actually has made.  The most obvious alleged harms are the torts—false arrest and outrage.  The court already has determined that the summary judgment facts present no basis for the jury to find that defendants caused plaintiff either of these harms.  In the words of the Kansas Supreme

55

Court, she has failed to marshal any evidence of "facts showing that more or better training would have prevented the harm." *Estate of Belden*, 261 P.3d at 968.

Plaintiff also has failed to produce admissible evidence that defendants had reason to believe their employees were not properly trained. "In order to state a claim of negligent training, however, plaintiff must establish that [defendants] had a reason to believe that [their] employees were not properly trained." *Keeler v. Aramark*, No. CV 09-1356-MLB, 2010 WL 11570205, at *3 (D. Kan. Aug. 12, 2010) (citing *Thomas v. Cty. Comm'rs of Shawnee Cty.*, 198 P.3d 182, 193 (Kan. Ct. App. 2008)) (granting summary judgment against claim). Plaintiff has come forward with no facts showing that defendants knew their employees lacked proper training. Indeed, the only evidence in the summary judgment record that informs this issue favors the opposite conclusion: the undisputed facts establish that defendants had not received any complaints for failing to accommodate a disabled person in the 10 years before plaintiff's arrest. By presenting no evidence to create a triable issue of fact, plaintiff has failed to establish defendants had reason to believe their employees were not properly trained.

In sum, plaintiff has failed to identify the particular harms she faced and how training could have prevented those alleged harms. She also has failed to adduce admissible evidence that defendants had reason to believe their employees were not properly trained. For these reasons, the court grants defendants summary judgment against plaintiff's negligent training claim.

This leaves plaintiff's negligent supervision theory. To be sure, Kansas law recognizes this cause of action. As the state's court of appeals has explained, negligent supervision "entails either inadequate oversight and review of an employee in the performance of [the employee's]

job duties or failing to control an employee with propensities that might pose a danger." *Estate of Belden*, 261 P.3d at 968.

Here, the second half of this formulation is easily dispatched. Plaintiff has identified no admissible evidence that Corporal Beightel or Deputy Dobler presented propensities that might pose a danger to plaintiff. The same deficiency exists for the other employees criticized by plaintiff's summary judgment Opposition. In short, she has failed her summary judgment burden to substantiate this form of a negligent supervision claim.

Plaintiff's summary judgment response is equally deficient under the first half of *Belden*'s formulation. This form of negligent supervision requires plaintiff to adduce admissible evidence that defendants provided "inadequate oversight and review" of an employee in the performance of the employee's job duties. *Belden* explains how a plaintiff might shoulder this burden: "[P]olicies and procedures falling below accepted practices in an industry or otherwise failing to conform to standards of reasonable care may create tort liability." 261 P.3d at 969 (citing *Dye v. WMC, Inc.*, 172 P.3d 49 (Kan. Ct. App. 2007)).

The *Belden* plaintiff tried to marshal such evidence. It retained an expert who gave an affidavit opining about certain subjects relevant to the jail setting at issue in that case. And while the court of appeals ultimately concluded the expert's opinions were inadequate[9] to forestall summary judgment, at least those opinions constituted some evidence.

Plaintiff here has done far less. She has not presented an affidavit or expert report opining that defendants' policies or procedures "fall[] below accepted practices" in the law enforcement industry, or "otherwise fail[] to conform to standards of reasonable care." *Id.* To say it directly, she offers even less to carry her burden than the unsuccessful *Belden* plaintiff

---

[9]    The affidavit proved inadequate, the Kansas court concluded, because it merely used legal terminology and offered no more than "conclusory" opinions. *Belden*, 261 P.3d at 969.

offered.  Instead, her summary judgment response relies solely on her lawyer's argument.  As *Belden* makes clear, this tactic will not suffice.

In sum, the summary judgment record here is more deficient than in *Belden*.  For that reason, the court concludes that this plaintiff's negligent supervision claim must conclude in the same way the same claim concluded in *Belden*:  with entry of summary judgment.

## IV.    Conclusion

In sum, the court grants defendants summary judgment against all plaintiff's claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Summary Judgment (Doc. 64) is granted.

**IT IS SO ORDERED.**

**Dated this 5th day of April, 2018, at Topeka, Kansas.**

                                                **s/ Daniel D. Crabtree**
                                                **Daniel D. Crabtree**
                                                **United States District Judge**